Howard F. Bishop, Appellee, v. Harley R. Bucklen, Individually and as Trustee Under Last Will and Testament of Herbert E. Bucklen, Deceased, Appellant.

Gen. No. 42,639.

Heard in the third division of this court for the first district at the April term, 1943. Opinion filed April 26, 1944. Rehearing denied May 12, 1944.

BELL, BOYD & MARSHALL, of Chicago, for appellant; DAVID A. WATTS and JOSEPH E. NOLAN, both of Chicago, of counsel.

ARTHUR A. SULLIVAN and JEROME J. SLADKEY, both of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

On December 23, 1937 Howard F. Bishop, a Chicago attorney, filed a complaint at law against Harley R. Bucklen, trustee, to recover damages for an alleged breach of an express contract to pay attorneys' fees for services in a special assessment proceeding in connection with the contemplated State street subway. Defendant, in due time, filed a jury demand. The pleadings consisted originally of a complaint against the defendant, as trustee, later broadened by an amended complaint, an amendment thereto and a second amended complaint to join as additional parties defendant the other trustees and all the *cestuis que trust* under the trusts created by the Herbert E. Bucklen will, and to seek recovery against the trust assets as well as against the defendant individually. Defendant first answered. When plaintiff sought a simultaneous recovery against him individually and the trust assets, defendant moved to dismiss, on the grounds that the second amended complaint was multifarious and that plaintiff should elect his remedy. This motion was denied. Defendant answered the second amended complaint, putting in issue the material averments regarding the alleged contract and the breach thereof, and plaintiff filed his reply denying the affirmative averments of the answer. The action did not proceed to trial on the law side of the court. Following several amendments to the original complaint, the case was transferred to the chancery side, where further amendments were filed. The case was

tried before a chancellor and a decree was entered directing a judgment in favor of plaintiff in the sum of $10,575 against Harley R. Bucklen, individually, and against the assets of the trust estate. Defendant, individually and as trustee, appeals.

Plaintiff's theory of the case is that he was hired on a contingent basis to defeat the whole assessment; that he did spend a great deal of time in ·preparation for the trial and thereafter that the dismissal of the assessment proceeding was due to his objections and his attack upon it; that the subway is now substantially completed without any special assessments and that the defendant has thereby benefited by plaintiff's efforts and expenditures made in the defeat of the old subway assessment. Defendant's theory of the case is (a) that the contract of employment was not to defeat the assessment but to reduce it, and consequently no fees could be earned for any "defeat" of the assessment proceedings by the plaintiff even assuming *arguendo* his efforts had something to do with the ultimate dismissal of the special assessment proceedings; (b) that plaintiff's efforts in the subway assessment case must, because of the contemporaneous trial of the condemnation case, have been quite limited in character; (c) that even if the contract were to defeat the subway assessment, the plaintiff's efforts had no causal connection with the dismissal, so no fee was earned; (d) that the plaintiff represented interests in conflict with those of the defendant on either the "reduction" interpretation or the "defeat" interpretation of the contract of employment, in the subway assessment case and in the condemnation case, and so is not entitled to compensation; (e) that since the plaintiff, an experienced lawyer, made his contract with two trustees knowing them to be trustees, concerning property which to his knowledge they owned and controlled only as trust property, there was obviously no intention that the trustees should be in-

dividually liable and individual liability is improper; and (f) that there is no basis in the record for a decree running simultaneously against the defendant individually and the trust assets.

In 1930 the city council of the city of Chicago passed ordinances designed to settle the Chicago traction problem and at the same time provide the city with rapid transit·subways. The principal ordinance was passed May 19, 1930, providing for a comprehensive unified local transportation system with the elevated and surface lines companies combined in a single ownership. On September 22, 1930 the city council passed an ordinance providing for the widening of North State street, north of the Chicago river along the route of the proposed subway. December 15, 1930 saw the passage of the ordinance levying a special assessment for the construction of a subway in State street from about Roosevelt road to Chicago avenue and for repaving the street. Still a fourth ordinance provided for a bridge at State street over the Chicago river and for certain approaches thereto. The unification ordinance was duly approved at a referendum and the city then proceeded to implement the ordinances by instituting in the superior court of Cook county, early in 1931, a condemnation case for the widening of North State street (*City of Chicago v. Johnston,* No. 524615, herein called the "Condemnation Case" or the "Widening Case") covering property from the river along the route of the proposed subway to its north end at Chicago avenue, and thereafter a special assessment proceeding for the construction of the subway itself (*In the Matter of the Petition of the City of Chicago for the Confirmation of a Special Assessment to Construct a Subway, etc.,* No. 2375, herein called the "Subway Assessment Case") covering property along the entire route of the subway. The ordinance for the widening of State street between the Chicago river and Chicago avenue provided

for the taking of about 29 feet on one side of the street and approximately 10 feet on the other side. The plan also contemplated the extension of the subway west in Chicago avenue to approximately Franklin street, where a ramp was to be erected to connect it with the elevated railway system. The General Assembly in 1929 had passed certain enabling legislation relating to traction unification and subways, and during the years 1931 and 1932 these acts were in the process of being ruled upon by the courts in the cases known as "The Bass Case" and the "Quo Warranto Case." These cases were decided July 26, 1932 by the Supreme Court of Illinois and the validity of the legislation upheld. (*People v. City of Chicago,* 349 Ill. 304.) The defendant Harley R. Bucklen was then cotrustee with Foreman State Trust & Savings Bank, the other cotrustee, of two separate trusts or funds established as alleged in plaintiff's second amended complaint, under the last will and testament of plaintiff's father, Herbert E. Bucklen, deceased. Upon the subsequent failure of the bank, defendant continued as sole trustee of one fund designated by the will as Fund C, but the defendant Peter D. Quigley was appointed sole successor trustee as to the other fund (Fund B) on or about July 14, 1933 by virtue of a decree of the circuit court of Cook county. Fund B included a hotel property of five or six stories located at 701-3 South State street, and Fund C included a rooming house property of three or four stories located at 807-9 South State street, both directly on the route of the proposed subway and included within Subway Assessment Case No. 2375.

Early in February 1931 Mr. William C. Miller, one of the trust officers of the Foreman bank, spoke to plaintiff Howard F. Bishop about representing the trustees in the subway assessment case, and as a result of this conversation a meeting for February 4, 1931 was arranged. The meeting was attended by

Bishop, Miller and Bucklen, and the only written memoranda made of the conversations were the two letters written the next day by Mr. Miller to Mr. Bishop. Mr. Bishop and Mr. Miller both testified. Defendant, Mr. Bucklen, was ill with influenza at the time and did not testify. Plaintiff specialized in the type of litigation involved in the widening case and the subway assessment case. According to Mr. Bishop he was engaged by the two trustees, who were known to him to be acting in such capacity to represent the property, which he knew was trust property, in the subway assessment case, to defeat the assessment on a contingent fee basis of 25 per cent. Mr. Miller testified in substance that plaintiff was employed to secure a reduction in the subway assessment, not to defeat the subway assessment proceeding, for which he was to be paid 25 per cent of the savings effected. Plaintiff represented a number of clients in the widening case and also in the subway assessment case, which were pending in the superior court and assigned to the same judge. The condemnation case (also called the widening case) to which defendant was not a party, was tried before the late Judge Ross C. HALL between April 27, 1931 and March 3, 1932. The trial occupied much of the time between those dates and the transcript ran over 11,000 pages in length. Plaintiff was the attorney among those representing defendants who was most active in presenting evidence. Upon the condemnation case going to trial it was announced by the court and understood by the various attorneys that the taking of evidence in the condemnation case would be completed before the subway assessment case would be tried. It was contemplated that the trial of the subway case would follow immediately as it had been continued from time to time during the trial of the widening case. The ordinance for the subway was introduced in the widening proceeding and its validity was there at-

tacked. This was recognized as a proper procedure. Plaintiff filed printed and written objections in the widening case, especially prepared by him for that particular case, consisting of approximately 72 pages. He spent 300 days in the trial of the widening case and a large amount of money for witness fees, experts, court reporters, etc. In the condemnation case plaintiff raised many objections going to the validity of the subway ordinance and he testified that he put in evidence in that case all the material relating to the objections he filed in the subway case which were identical with the objections filed in the condemnation case. Despite several colloquies between counsel in the condemnation case directed toward some stipulation or other device whereby the same evidence might not be required to be repeated in the subway assessment case, no such arrangement was ever made. Plaintiff's evidence in the condemnation case consisted of numerous experts on subway construction, soil conditions, traffic densities, real estate values and other matters. He has disavowed any attempt or desire to charge the defendant with any part of his work in the widening case; but testified that substantially contemporaneously with that trial he spent from 300 to 400 days' time in getting ready for the subway assessment case. Plaintiff asserts that the evidence introduced in the widening case was of benefit and could be considered as a portion of the subway assessment proceeding. Upon the completion of the evidence in the condemnation case early in March 1932 a small amount of evidence was taken in the subway assessment case by attorneys other than plaintiff. The elevated railroad, whose rapid transit lines would operate in the subway went into equity receivership on June 28, 1932. The next day Judge HALL, the trial judge in the condemnation case, accepted an appointment to the Appellate Court, stating to counsel that he considered the operation of the subway quite

uncertain. In December 1932 an agreement was reached between the city and certain property owners along State street to confer with respect to certain engineering objections, and the city withdrew its motion for trial in the subway assessment case. During the trial of the condemnation case numerous calls of the subway assessment case preliminary to trial were held before Judge HALL, but nothing transpired except numerous continuances pending the termination of the trial of the condemnation case. At the outset of both the condemnation and the subway assessment cases the city conceded that as a part of its case it had to show a tenant for the subway. Plaintiff's special objections were filed and his supporting evidence presented in the condemnation case prior to March 1932. Thereafter for two years all the interested parties, the city, the federal court, the security holders of the elevated and surface lines companies, and their committees, all exerted every effort to preserve the plan of reorganization, the consummation of which would have been to secure unification under the 1930 ordinance and a subway via the special assessment route and a tenant for the subway. On March 21, 1934 the mayor stated his views to the city council in a formal letter, accompanied by an opinion from the corporation counsel's office, recommending that the 1930 ordinance be allowed to lapse. This communication was not received in evidence. On April 3, 1934, pursuant to the mayor's recommendation, the 1930 ordinance expired without having been accepted, and in December 1934 a motion was made by the attorneys representing other defendants to have the subway assessment case dismissed as to their clients. It was this motion and supporting affidavit which provoked the meeting on December 20, 1934 before the committee on local transportation of the city council, which plaintiff attended. At that meeting plaintiff stated that his clients mostly favored the subway improvement by assessment, but that in

view of the contrary views of others of his clients and the lack of instructions from all of them, he was unable to take a position regarding dismissal. The motion to dismiss the subway assessment case was reported to the city council in a letter from the attorney for the board of local improvements. The city council referred the letter to its committee on local transportation, and on July 10, 1935 the city council directed the corporation counsel to dismiss the subway assessment case for the reason that the Chicago Local Transportation Company, the prospective tenant for the proposed State street subway, did not accept its grant. On July 12, 1935 the case was dismissed as to all objectors on motion of an attorney who was not associated with plaintiff. The order of dismissal recited specifically that the reason for the dismissal was the lack of a tenant for the subway. The court at the same time entered an order dismissing the case as to those objectors who presented their motion and affidavit. The latter order was excluded by the trial court. The written motion to dismiss was orally joined in by the plaintiff. The reason assigned in the order of dismissal, lack of tenant, was one of the objections raised and alleged by plaintiff. After the subway assessment case was dismissed, plaintiff presented a bill to defendant, as trustee, for "legal services rendered in filing objections to assessments . . . and securing cancellation of same . . . ," divided as between the two trust funds in the amount of 25 per cent of the original assessment or an aggregate of $10,575.

The first point advanced by defendant is that since plaintiff was employed to reduce the subway assessment rather than to defeat it, he is entitled to no compensation for the dismissal of the proceedings, even assuming that his efforts had something to do with the dismissal. Plaintiff insists that he was employed to defeat the subway assessment, not merely to reduce it. The employment was arranged at a confer-

ence between himself and the two trustees, held on February 4, 1931, almost 12 years prior to the trial. Plaintiff testified that he made no memorandum of the conferences, the only writing concerning it being the two letters written by Mr. Miller to plaintiff the next day. Plaintiff testified that he was hired not on a reasonable fee basis, but on a contingent basis of 25 per cent to knock out, or to kill the assessment. Mr. Miller testified: "I asked Mr. Bishop what his charge would be, and he said it would be $33\frac{1}{3}\%$ of the savings effected. I am quite sure that I had previously discussed the question of fees with Mr. Bishop, and in the course of our conversation, dickered or bargained with him a bit, because of other cases that he had had for us in the past. I had had some previous preliminary discussion with Mr. Bishop and suggested that he ought to do it for less than $33\frac{1}{3}\%$ in this instance. Mr. Bucklen has voiced his sentiments along the same line, and we agreed on 25%. That is the substance of the conversation that occurred at that time. . . . That arrangement was confirmed." Mr. Miller further testified that in discussing the question of fees and the fact that plaintiff's charge "generally speaking was $33\frac{1}{3}\%$," he said to plaintiff: "In view of the fact that you have represented the bank in numerous matters, Michigan avenue and South Water street, and other matters of that sort, I am sure that is about the words I used, that he should give us a special rate in this particular case." On cross-examination Mr. Miller testified: "Whatever percentage we were to pay, of course, was to be based upon the savings in the amount of the assessment." Witness further testified: "The property at 701 South State street was on the corner and had five or six stories. I don't remember, but I am inclined to believe that something was said in our conversation about the subway opening being in front of the building. Probably we discussed that." Asked as to

whether anything was said in the preliminary talk to the effect that the trustees wished to employ plaintiff to "knock out the subway assessment," he answered: "I have no recollection of any discussion of that nature." Asked: "Do you recall any conversations prior to the meeting of February 4, to the effect that the trustees wished to employ Mr. Bishop to defeat the subway assessment? I think you might answer that first, yes or no, and then if you wish to explain your answer, that is something else." He answered: "I can't answer it yes or no. I can say we employed him, I can do that, but I can't answer that question yes or no. I am going to say that it was my distinct understanding that we employed Mr. Bishop. I will say that we employed Mr. Bishop to represent us in this matter. We wanted whatever protection we were entitled to receive, depending upon the circumstances, and he was an expert along these lines and we were faced with these assessments, and we wanted—we employed him to protect us in the matter. . . . Nothing that I recall was said at the conference between Mr. Bishop, Mr. Bucklen and myself on February 4, 1931 to the effect that the trustees desired the subway assessment to be completely knocked out." Asked: "Was there any conversation to the effect that you wished it reduced in amount?", he answered: "I am very sure that it was our feeling that the assessment was limited in its spread and the spread should have been extended materially and taken in a very much wider distribution." He testified that he meant that the property assessed should have been extended geographically further back on either side of the street. Asked: "Was anything said at that conference of February 4, 1931 regarding the possible benefit to the property from the building of the subway?", he answered: "There was a feeling that property located where there would be subway stations would be somewhat benefited." Asked: "When you say there was a feeling to that

effect, are you describing something that was subjectively in your mind and Mr. Bucklen's mind, or are you giving a shortened description of part of the conversation of February 4th?'' he answered: ''I am saying this; that I am quite sure that Mr. Bucklen and the officers of the bank felt or were of the opinion that if a subway station were located at or near the properties that it might be of some benefit.'' Asked: ''Was that discussed with Mr. Bucklen in the meeting of February 4th?'', he answered: ''I am inclined to think it might have been. I don't know definitely. I can't remember exactly.'' Asked as to whether he recalled anything being said at the meeting of February 4th to the effect that plaintiff would be paid, or that witness would see that he was paid, he answered: ''There wasn't any question about our hiring Mr. Bishop, and when we hire a man we intend to pay him. We did hire him at that time. Of course, we expected to pay him.'' On cross-examination, in answer to a question as to whether under the proposed plan subway stations were to be erected under either of the parcels, he answered: ''It wasn't definitely determined at that time. It had not been definitely determined at that time. I don't think there had been plans prepared at that time. I don't recall.''

The conversation respecting the terms of employment was held on February 4, 1931. On the stationery of the bank, Mr. Miller, signing as vice president, sent two letters to plaintiff, dated February 5, 1931, one of these letters with the heading, ''Re: H. E. Bucklen Trust,'' reads:

''We handed to you yesterday notice from the Board of Local Improvements affecting property at 807-9 South State Street in the sum of $22,500. This property is about a block south of Seventh Street and may or may not be affected by subway openings. We feel that this is a matter for special consideration in that the building may be materially damaged by the build-

ing of the subway and possibly greatly benefited if openings are made at such a point as will be at or near the property. It is our understanding in conversation with you and Mr. Bucklen yesterday, that your service charge, including all court costs, all attorneys' fees, all fees of real estate experts, and any other items, shall be reasonable depending upon circumstances, the amount of time involved, etc., and in no event to exceed 25% of the savings or reduction of the assessment."

The other letter, headed "Re: Quigley Trust Under Bucklen Will," reads:

"We have today delivered notice of the Local Improvement Association re subway to you, affecting property at 701–3 South State Street in the sum of $19,800. We are told that there is to be a subway opening right in front of the building, and if so, the property should be materially benefited and we are handing this case to you because we feel it should have special treatment, being on State Street. Building of the subway may affect the foundation of the property and thereby damage it; if so, we should be properly protected. It is our understanding in conversation with you and Mr. Bucklen yesterday, that your service charge, including all court costs, all attorneys' fees, all fees of real estate experts, and any other items, shall be reasonable depending upon circumstances, the amount of time involved, etc., and in no event to exceed 25% of the saving or reduction of the assessment."

On February 17, 1931 plaintiff wrote Mr. Miller two letters, one with the heading "In re: H. E. Bucklen Trust," reading:

"Referring to your letter of the 5th inst., in regard to the above entitled matter, I have looked after the objections in this case and will handle the matter in accordance with the terms outlined in your letter of

that date. If the owner has a survey and plans showing the first story and foundations, particularly with reference to whether there are caissons or floating foundations, depth, etc., with the elevation marks, it would be very helpful in preparing the necessary cross petition. P. S. Please advise the correct legal title, in other words, the exact name of the owner.''

The second letter of that date, headed ''In re: Quigley Trust Under Bucklen Will,'' reads:

''I do not believe that I have formally acknowledged your letter of February 5th in the above entitled matter. Of course, I have looked after the objections in this case and will look after the matter in accordance with the terms outlined in your letter of February 5th. If the owner has a survey and plans showing the first story and the foundations, particularly with reference to whether there are caissons or floating foundations, depth, etc., with the elevation marks, it would be very helpful in preparing the necessary cross petition. P. S. Will you kindly advise the exact way in which the legal title is held at the present time, in other words, the exact name of the owner.''

Plaintiff testified that he spent a considerable amount of time in the 12th street condemnation case, the Michigan avenue widening case, the Western avenue, Ashland avenue, South Water street and the various La Salle street improvements. Plaintiff further testified that in the conversation of February 4, 1931, Mr. Miller said: ''What points have you in mind in the way of knocking out this assessment entirely?'', and he answered: ''Well, I have in mind that this improvement of a subway is what we lawyers call a general improvement, and not a local improvement.'' He stated Mr. Miller said: ''If that objection is sustained, would that knock out the assessment entirely?'', to which plaintiff answered: ''Yes, it would knock out the entire assessment, and the subway also, and Mr. Miller and

Mr. Bucklen said: 'Well, that would be quite satisfactory.' '' Plaintiff further testified that Mr. Miller said: ''Are there any other points that you have in mind that would go to defeating the entire improvement?'', and that plaintiff replied: ''Yes, one of our other points, or one of my other points, is that this is a private improvement, and not a public improvement, in that it connects up solely with the Chicago Rapid Transit Company, and it is for the purpose, among other things, of carrying the Rapid Transit service, and carrying freight, that the North Shore Line would use it.'' Plaintiff testified further: ''Then he asked whether there was any other basic point, and I said: 'Yes, our position is that there is no tenant for this subway at the present time. There is no use that can be made of it, because there has been a considerable amount of talk about some company that would use it, but so far, that has not reached any definite determination, and there is no means of using the subway.' These were the basic things. And then he said, what did I propose to do? And I said, well, we expected to engage real estate men and engineers and go into it in detail for the purpose of determining all of the different points, in connection with the case; and he said: 'Well, that is exactly what we want to do,' and he said, 'Will it receive your personal attention?' and I said, Yes, I expect to devote practically all of my time to this as long as the case lasts.'' Plaintiff states that the testimony of Mr. Miller shows that his recollections were not vivid, while he, plaintiff, testified clearly to the substance of the conversation, and that in view of this testimony, considering the failure of the defendant to testify and considering the admitted lack of clarity in Mr. Miller's testimony, the chancellor who saw and heard the witnesses and was in the best position to make a finding, had no alternative but to find as he did, that the contract was one to defeat, not to reduce, the assessment. Defendant argues that the contempora-

neous letters indicate a clear expectation on both sides of the employment that the subway would go through. In *Toppan Co. v. McLaughlin*, 120 Fed. 705, the court said (706):

"Where there is such a direct conflict in the oral testimony, documentary evidence, like the correspondence between the parties, becomes of paramount importance. Such evidence, if pertinent, is controlling since it is the best evidence, and in every way more satisfactory and convincing than the recollection of witnesses as to conversations which occurred more than two years before."

In *Kent v. Manchester*, 29 Barb. (N. Y.) 595, Chancellor BACON used the following language:

"Recollections are sometimes dim, and impressions deceitful and illusory, but the written stands and speaks a uniform language."

We agree with defendant that the letters show that the trustees expected the subway to be built, and that they visaged the possibility of great benefits to the trust property from nearby stations. In these letters Mr. Miller was also apprehensive that the actual building of the subway might affect the foundations of the property and thereby damage it and materially damage the buildings. When plaintiff replied to Mr. Miller's letters he requested a survey and plans showing the first story and the foundations, particularly with reference to whether there were caissons or floating foundations, depth, etc., with the elevation marks, and stated that they would be helpful to him in preparing "the necessary cross petition." A cross petition would be necessary only if the subway were built, with consequential damages to the buildings. We agree with defendant's contention that the concluding paragraph of the letters dated February 5, 1931 that the fees were "in no event to exceed 25 per cent of the savings or reduction of the

assessment," is couched in language indicating that the upper fee is not to be 25 per cent of the entire assessment, as would be the case if plaintiff were being hired to defeat the assessment entirely, but 25 per cent of the amount by which the assessment might be reduced. While plaintiff testified positively as to his recollection of the conversation relative to his employment, his memory of several important facts concerning the conduct of the litigation was faulty. It is interesting to note that in the 12th street, Michigan avenue, Western avenue, South Water street and La Salle street cases that the improvements went through, and that Mr. Miller became acquainted with plaintiff through the latter's representation of the bank in the Michigan avenue and South Water street matters, and other cases. In their conversation of February 4, 1931, the plaintiff and Mr. Miller, in all probability, had in mind the results achieved in the Michigan avenue, South Water street and other cases handled by plaintiff. Mr. Irvin Rooks, who specialized in the same type of litigation as plaintiff, testified that "In those cases where the subway was completely defeated, and the assessment therefore canceled, and the property owner technically saved the entire assessment, consideration was frequently given to the fact that the property owner at the same time did not receive the improvement, and therefore did not receive some benefit which he might have expected had the improvement gone in; and at least in my practice, it was customary to make some adjustment of the one-third fee, having due regard to the whole value of the service rendered, when the improvement was entirely defeated." Asked: "And isn't it a fact, Mr. Rooks, that it was pretty generally the custom in the special assessment field to take care of this possibility of a dismissal or a complete defeat with a much smaller percentage than one-third, it might be three, four or five percent?", he answered: "No, I would not say it

was customary to anticipate that eventuality. Sometimes it was done; and when it was so anticipated, I don't know of any cases that were as low as three or four percent. I have heard of some that were as low as five percent. In the case of a dismissal of a special assessment case, it might frequently be that the City would start over again with another special assessment proceeding against the same property. If a property owner made the usual 33⅓% contingent fee arrangement and no different consideration were given in the event of a defeat, if the City brought three cases against him in three successive years, and the 33⅓% rule were applied, he would pay the whole thing. That is why I stated a while ago that in those cases where there was a defeat or a dismissal of the proceeding, in my practice at least I found that the proper thing to do was to make some adjustment, having due regard to what has been done, and the value of the service rendered.'' We find that the evidence does not sustain the chancellor's finding that plaintiff was employed to defeat the subway assessment, not merely to reduce it. The weight of the evidence establishes that plaintiff was employed to reduce the subway assessment rather than to defeat it. The contract was entirely silent on plaintiff's compensation in the event of a dismissal. In connection with the same point defendant argues that as plaintiff was employed to reduce the assessment rather than to defeat it, he cannot recover for the dismissal of the subway assessment case, even assuming that he had something to do with causing its dismissal. Plaintiff urges that even though he was employed to reduce the assessment, the defeat of it constitutes a reduction and that in fact the defeat of the assessment was a complete extinction, reducing the assessment to nothing; that the greater includes the lesser, and that he is entitled to his fee regardless of whether the contract be deemed one to reduce or to defeat the assessment. These contentions

are not valid. As Mr. Rooks stated, where the assessment case is defeated, the property owner does not receive the benefit of the improvement. In our opinion the defeat of the assessment case is not comparable to a reduction of the assessment. Plaintiff's argument overlooks the contemporaneous correspondence.

Plaintiff maintains that even though he had been employed to reduce the assessment, he would still be entitled to a fair and reasonable compensation for the services rendered in that effort up to the time of the dismissal, whereupon (under defendant's theory) it then would have become impossible to further perform, and that the cases cited by the defendant that the attorney is not entitled to compensation where he fails to perform his contract, are not applicable. Again plaintiff says "no case was cited by the defendant that where performance was interrupted, as claimed by the defendant, then that recovery on *quantum meruit* is impossible." We agree with the assertion of defendant that like a party to any other kind of contract, a lawyer must perform according to the terms he has agreed to in order to be entitled to performance by the other side. A lawyer who is employed to carry on or to defend litigation along certain lines cannot recover a fee for work which is not only different from what he was employed to do but is opposed to the results desired by his client. As to the suggestion of plaintiff that in any event he should be allowed recovery upon *quantum meruit,* plaintiff tried his case on the theory of an express contract rather than *quantum meruit.* His complaint is also grounded on the theory of an express contract. It is elementary that a complainant in a chancery suit cannot make one case by his bill in the lower court and in a reviewing court be allowed to make another and entirely different one. This court has frequently so declared, and we have also expressly declared that "this court re-

views a case presented to the trial court and does not sit to try issues presented for the first time in this court.'' (*Wollenberger v. Hoover,* 346 Ill. 511, 539.)

The second point advanced by defendant is that plaintiff's efforts were very largely and necessarily spent in connection with the condemnation case, in which defendant was neither a party nor chargeable with plaintiff's efforts, and consequently contemporaneously could have done only a small amount of work in the subway assessment case. Plaintiff answers that he spent a great deal of time on the subway assessment case alone. The third point urged by defendant is that since the eventual dismissal of the subway assessment case was in no way due to plaintiff's efforts, he is not entitled to any fee for his services. Plaintiff maintains that the dismissal of the subway assessment case was due chiefly to his efforts. As we have seen, the trial of the widening case extended from April 27, 1931 to March 3, 1932, and occupied much of the time between these dates. In the widening case plaintiff raised the same point in his objections as he did in the subway assessment case, and filed the same specific objections he had filed in the subway case as additional objections in the widening case. He presented a great volume of evidence in support of these objections. The issue in the widening case was directed to the validity of the subway proceeding and practically all of the proceedings in the widening case were directed to the validity of the subway ordinance. However, plaintiff does not seek to charge defendant for work done on the widening case. In the subway assessment case plaintiff filed the usual form of general objections and then additional special and specific objections. He, or an associate, attended various preliminary calls of the assessment case. Plaintiff testified that beginning with the early part of 1931 up to approximately May 1932 he spent at least one legal day on the subway assessment case every single day,

or a total of not less than 300 and probably nearer 400 days. He kept no record of his time because he had the matters in the subway case on a contingent basis and there was no point in keeping a record. Defendant suggests that when it is borne in mind that throughout most of this period plaintiff was actively engaged in the trial of the condemnation case, and that he used as his witnesses in that case the same experts he was conferring with outside of court hours, then plaintiff's story becomes a sheer impossibility. Defendant states that no lawyer as expert in special assessment and condemnation cases as plaintiff would try his case through 11,000 pages of testimony without thoroughly preparing that particular case day by day as it progressed and without extensive collaboration with his numerous expert witnesses with regard to their testimony and the presentation thereof in that particular case. It is unnecessary for us to decide whether the proof establishes that plaintiff spent between 300 and 400 days on the subway assessment case.

We turn to a consideration of defendant's argument that to earn his fee plaintiffs efforts must have resulted in the dismissal of the subway assessment case and that the dismissal of that case was in no way due to plaintiff's efforts. Paragraph 4 of the second amended complaint alleges that "pursuant to said employment plaintiff entered the appearance of said defendant and said parcels in said proceedings and filed objections to said assessment petition and entered upon the trial of the same and spent approximately 400 days in court in the trial thereof, where approximately 11,000 pages of testimony were taken, and that plaintiff paid large sums of money for costs, court reporter, transcript of testimony, experts' fees, and other sums, and that as a result of efforts of plaintiff that the said special assessment petition was dismissed on or about July 15, 1935." Defendant answered this allegation by denying that as a result of plaintiff's ef-

forts the special assessment petition was dismissed on or about July 15, 1935, and averred that the special assessment petition was dismissed because ''the City of Chicago refrained from prosecuting the same owing to the failure of any traction company to accept the traction ordinance passed by the City Council of Chicago for the use of the proposed subway,'' and that ''upon the failure of the City of Chicago to prosecute said special assessment proceeding the court dismissed the proceeding upon the motion of one Mr. W. T. Hapeman, attorney for certain objectors therein.'' Defendant urges that assuming, *arguendo,* that plaintiff was employed to defeat rather than to reduce the assessment, he has failed to make such proof. Plaintiff relies upon an express contract of employment. The reason for the dismissal of the special assessment case was clearly stated in a letter dated December 12, 1934 from the attorney for the board of local improvements to the city council, reading, in part, as follows:

''Gentlemen: Yesterday we were served with notice by attorneys representing the majority group of the assessees in the State street subway case, which group is known as the 'Property Owners Committee on Subway Assessments' that on December 18, 1934 they will appear before the honorable James J. Kelly, judge of the Superior Court of Cook County and move the court to dismiss the case known as special assessment case number 2375. . . . When the subway case went to trial in 1931 it was necessary for the city to prove among other things that it had a tenant for the subway before a judgment of confirmation could be entered. To establish this point the city offered in evidence the 'Comprehensive Traction Ordinance' and promised to supplement this offer with proof of its acceptance by the Chicago Local Transportation Company. The company having failed to accept the ordinance within the time prescribed and the 'Comprehensive Traction Ordinance' having terminated, the city has been un-

able to present a case to the court which would warrant a final judgment. . . . Until a new ordinance is adopted providing a tenant for the subway the case cannot be maintained. Unless it is the intention of your honorable body to take up at an early date the matter of tenancy, use and occupation of said proposed subway we will be unable successfully to oppose said motion to dismiss the suit.''

The special assessment case was dismissed as to all defendants on July 12, 1935, by an order, reading:

''This cause coming on to be heard on the legal objections heretofore filed by W. T. Hapeman, attorney for certain objectors, and it appearing to the Court that 'An Ordinance providing for a comprehensive unified local transportation system for the City of Chicago and metropolitan area,' passed by the City Council of the City of Chicago on May 19, 1930, has never been accepted by any transportation company, and that the ordinance by reason of the failure of acceptance lapsed on April 3, A. D. 1934, after several extensions of time allowed by the City Council of the City of Chicago. It is therefore ordered, adjudged and decreed that the legal objections heretofore filed by W. T. Hapeman to the petition in the above entitled cause, be and the same are hereby sustained and the petition dismissed as to all defendants.''

It will be noted from the recitals of the order that the dismissal was neither on plaintiff's motion nor on his objections.

To give the chancellor the complete background of the colloquies before the superior court in the subway assessment case, and to explain fully the communication of the attorney for the board of local improvements to the city council and the part played by plaintiff in the actual dismissal of the case, defendant offered in defense the motion of 19 attorneys to dismiss the case, together with the supporting affidavit of

Graham Aldis. The proffered exhibits were excluded
by the court. In our opinion they were material and
pertinent and should have been admitted. They show
what Judge KELLY had before him at the time he en-
tered the order of dismissal. The affidavit of Mr.
Aldis reads, in part, as follows:

"On March 12, 1931, in case Number 2375, the City
of Chicago offered in evidence, as part of its case, the
above mentioned Comprehensive Traction Ordinance
and promised later to supplement the offer by proof
of its acceptance by Chicago Local Transportation
Company. On April 3, 1934 the Comprehensive Trac-
tion Ordinance expired and became null and void be-
cause it never was accepted by Chicago Local Trans-
portation Company within the time limit fixed by the
City Council. Affiant is advised that this Special As-
sessment Case Number 2375 cannot now proceed to
trial in view of the fact as above stated that said Com-
prehensive Traction Ordinance is no longer in exist-
ence. The only purpose for which case Number 2375
can be retained for trial is to confirm special assess-
ments for the purpose of constructing the identical
subway described in the Subway Ordinance. Never-
theless, the Subway Ordinance is technically still in
force and effect and this case Number 2375 has been
pending without trial for almost four years and the
assessments spread against more than 2,000 pieces of
real estate thus remain of record, thereby clouding the
titles and constituting a threat of further proceedings
against the owners thereof. Immediately after case
Number 2375 was filed, a considerable number of the
owners of properties thereby made contingently liable
for special assessment taxation, established contingent
reserves in their books of account and until case Num-
ber 2375 is disposed of said owners are advised by
their auditors and it is improper to release said con-
tingent reserve accounts. Since the time when the cost
of the construction of the proposed subway was esti-
mated and said assessment roll was spread great

changes have taken place in such costs of construction and great changes have taken place in the value of the real estate that was assessed. Affiant is also informed and believes and therefore states that the City of Chicago would not be able to pay and will not for many years be able to pay any substantial amounts for public benefits or for the construction of the proposed tunnel under the Chicago River, either out of the Traction Fund or otherwise.''

The motion by the 19 attorneys representing objectors, erroneously excluded, reads:

''Now come the objectors, whose names are set down in the schedule of the lands attached to the objections to assessments, represented in the proceeding by Messrs. Wilson & McIlvaine and Scott, MacLeish & Falk as their attorneys, and also all other attorneys for objectors listed in an 'Order for Separate Hearing' entered herein on February 15, 1932, and move the court that an order be entered dismissing this proceeding without costs to any objector. In support of this motion, the objectors append hereto the affidavit of Graham Aldis.''

The order entered by Judge KELLY on July 12, 1935 and erroneously excluded, reads:

''This cause comes on to be heard on the 12th day of July, A. D. 1935, upon the motion of objectors, represented by Wilson & McIlvaine, Scott, MacLeish & Falk, and their associated counsel, to dismiss this cause, which said motion was entered herein on December 8, 1934, and continued by order of court thereafter from time to time until this date. And, upon consideration of said motion it is hereby ordered by the court that said motion be, and the same hereby is, granted, and this cause is now dismissed as to said objectors.''

The chancellor also excluded Mayor Kelly's letter to the city council, dated March 21, 1934. The chief condition precedent to the entire 1930 traction program was

the acceptance of the main ordinance by a unified local transportation company. In an endeavor to make this possible, the city council from time to time extended the date for the acceptance of the ordinance until April 3, 1934. On March 21, 1934 the city council met and the question of another extension was up for consideration. At this time the mayor submitted a letter addressed to the city council and accompanied by an opinion by the corporation counsel's office as to whether it would be possible to amend the traction ordinance without submitting such amendments to referendum. In this letter and opinion no mention is made of the points raised by plaintiff. The letter from the mayor in part, reads:

"As early as September, 1933 the traction interests were notified by the chairman of the local transportation committee and the mayor that the ordinance should be accepted or rejected without further delay. Despite the efforts of the committee on local transportation, of Mr. Walter L. Fisher and of the Honorable James H. Wilkerson, United States district judge, the security holders of the surface lines and elevated railroads failed to effect a reorganization of the transportation systems so that the ordinance could be accepted by the Chicago Local Transportation Company. In the meantime transportation service has greatly deteriorated. A careful analysis of the comprehensive traction ordinance of 1930 has convinced me that it does not meet the present needs of the city. There has been such a radical change in the economic condition of our city and nation since the provisions of that ordinance were formulated that many of the benefits which the city and the people had hoped would result from its immediate acceptance cannot possibly be realized. It is my recommendation that the ordinance extending the time for the acceptance of the comprehensive traction ordinance of 1930 should not be passed."

This was an official communication from the mayor to the city council. It was material and pertinent to the

issue before the chancellor and should have been received. The journal of the proceedings of the city council of March 21, 1934, pages 1830 to 1835, show the communication of the mayor, the opinion of the corporation counsel, and that the following motion was adopted:

"At the request of Alderman Bowler unanimous consent was thereupon given for consideration of the report of the Committee on Local Transportation in the matter of an extension of time to and including May 3, 1934, for acceptance by the Chicago Local Transportation Company of an ordinance passed May 19, 1930, providing for a comprehensive unified local transportation system for the City of Chicago and metropolitan area, and in the matter of consenting to further day-to-day unified operation of street railways to and including May 3, 1934, which report was deferred and published March 14, 1934, page 1655. Alderman Bowler moved that the ordinances recommended in said report [printed in Pamphlet No. 55] be placed on file."

The transcript of the hearing of July 12, 1935, at which the special assessment case was dismissed, is in evidence, and in that entire hearing of over six pages of transcript in which first Mr. Cooper (one of the 19 attorneys) and then Mr. Hapeman were discussing and moving for the dismissal of the proceedings, plaintiff contributed the following: "I am prepared to make a motion or join in the motion." The case, however, was dismissed on Mr. Hapeman's motion. The order of dismissal states the ground, namely, failure of the transportation company to accept the 1930 ordinance. Plaintiff urges that the findings of fact of the chancellor must be sustained unless manifestly against the weight of the evidence, and that the chancellor's findings were eminently proper and not manifestly against the weight of the evidence. Plaintiff also states that if his efforts did result in or contribute to the dismissal, defendant's whole argument under this point falls

and becomes inapplicable because his argument is predicated on the assumption that plaintiff's efforts did not contribute to the dismissal. Plaintiff also points out, and we accept his statement, that in a special assessment proceeding the filing of objections constitutes a motion to dismiss the proceeding as to the parcels represented, but contrary to the practice in a common-law action, where that question is determined entirely upon the pleadings, in the special assessment proceeding evidence is admissible in support of the motion and objections. Plaintiff declares that all of the evidence introduced by him was in support of the many and substantial objections which had been filed by him; that the introduction of testimony in support of objections is common practice and is invariably necessary for the determination of the questions involved; that it is apparent that the assessment was dismissed as to defendant's property, because of the objections filed by him (plaintiff) and more especially because of the introduction by him of a vast amount of pertinent evidence in support of the objections, and in the attack upon the validity of the assessment as to property involved here. It is true that plaintiff in his "additional special and specific objections" filed in the subway assessment case, raised the point that the ordinance providing for the operation of transit facilities in the tunnel had not been accepted. The city took a like position from the outset of both proceedings. There was no dispute on this point. The letter from the attorney for the board of local improvements to the city council dated December 12, 1934, recognized that when "the subway case went to trial in 1931 it was necessary for the city to prove among other things that it had a tenant for the subway before a judgment of confirmation could be entered," and that "to establish this point the city offered in evidence the 'comprehensive traction ordinance' and promised to supplement this offer with proof of its acceptance by the Chicago Local Transportation Company." On April 23, 1931 Mr.

George Mason, one of the city's attorneys in the widening case, stated to the court: "Whether your Honor will enter a judgment in this case depends upon our being able, later on, to offer your Honor a complete, effective franchise ordinance, so there will be a tenant for a part of the subway structure. There is nothing new about that, the Supreme Court has approved the practice repeatedly in allowing the petitioner, if necessary, to take time to bring in the necessary collateral ordinances. There is no question about that." We agree with defendant that the record of actual events demonstrated completely how entirely disconnected the ultimate dismissal was from anything the plaintiff did in the assessment case, or even in the condemnation or widening case. The evidence was completed in the widening case about March 3, 1932. By that time the city, as plaintiff's opponent, had the benefit of all his objections and all the evidence he had taken under them in the widening case. Nevertheless, it is undisputed that for the next two years the city, the federal court where the lines were in receivership, the security holders and their committees all exerted every effort to bring about a consummation of the comprehensive unified local transportation system plan, including a subway by special assessment under the special assessment ordinance. As a matter of fact, by December 1934 a majority of plaintiff's clients were in favor of the subway going through by the special assessment route. Their efforts were blocked, not by plaintiff, but by the failure to procure a tenant, the depression and the resulting nonfeasibility of the entire plan. We are satisfied that the dismissal of the subway assessment case was in no way due to plaintiff's efforts and that the finding in favor of plaintiff on this phase of the case is contrary to the manifest weight of the evidence.

Plaintiff asserts that assuming for the purpose of argument that his efforts did not result in the dismissal or contribute thereto, nevertheless, he, having per-

formed considerable service and incurred considerable expense, would be entitled to his compensation because the result sought was attained; or he would be entitled to fair and reasonable compensation for services rendered even though he did not contribute to the accomplishment of the object; that the record clearly shows that he not only was a contributing cause, but that he was actually the sole cause, and that even though he was not a contributing cause he would be entitled to either fee fixed by the contract, or fair and reasonable fees for services rendered; and that upon either theory, the judgment is proper. We have heretofore stated under another point that plaintiff tried his case on the theory that he had an express contract, and that as a result of his services the proceedings were dismissed. It is a well-settled rule of law that a person cannot try a case on one theory in the trial court and on another theory in a court of review. *Lewy v. Standard Plunger Elevator Co.*, 296 Ill. 295, 304.

Other points urged by defendant are that any claim plaintiff might otherwise have to a fee is rendered invalid by his representation of conflicting interests; that if plaintiff has any claim, it should run only against the separate trust funds, not against the defendant personally; and that plaintiff cannot, on this record, have a judgment running simultaneously against the defendant personally and also against the assets of the trust. As the propositions we have ruled on dispose of the case, we will not extend this opinion by a discussion of the remaining points. For the reasons stated, the decree of the circuit court of Cook county entering a judgment against defendant is reversed and the cause remanded with directions to dismiss the second amended complaint for want of equity at plaintiff's costs.

*Reversed and remanded with directions.*

KILEY, J. concurs.

HEBEL, P. J., took no part.